## Case No. 4,050.

### In re DOYLE.

[1 Holmes, 61.][1]

Circuit Court, D. Rhode Island. June, 1871.[2]

BANKRUPTCY—INSOLVENCY OF TRADER — FRAUDULENT PREFERENCE—DISCHARGE.

1. A trader is insolvent within the meaning of the bankrupt act [of 1867 (14 Stat. 517)] when he is unable to pay his debts as they fall due, in the ordinary course of business.

2. A payment to one of his creditors. made out of the ordinary and regular course of business by an insolvent debtor, within four months of his petition in bankruptcy, he then knowing himself to be insolvent, is a fraudulent preference within the meaning of the twenty-ninth section of the bankrupt act, and will prevent the granting of a discharge in bankruptcy to such debtor, although the preferred creditor at the time of the payment had not knowledge, nor reasonable cause to believe, that the debtor was then insolvent.

Petition in bankruptcy for review and reversal of a decree of the district court, denying an application of the petitioner [Louis J. Doyle] for a discharge in bankruptcy. [See Case No. 4,051.] The facts are stated in the opinion.

T. A. Jenckes and C. Hart, for petitioner.

C. S. Bradley, O. Lapham, and B. N. Lapham, for opposing creditors.

SHEPLEY, Circuit Judge. The creditors of Louis J. Doyle, a bankrupt, filed specifications in the district court in opposition to his petition for discharge. Upon a hearing before the district judge, upon his application for discharge, and the specifications of the creditors in opposition thereto, the prayer of the petition for discharge was denied by the court. The bankrupt thereupon filed his petition in this court, sitting as a court of equity, for a revision of alleged errors in the rulings and decree of the district court, praying for a reversal of the judgment of the district court, and that a discharge be granted to him as prayed for in his application. In determining the question of the right of the bankrupt to a discharge, the district judge denied the application, upon the ground that the allegation of the opposing creditors was sustained by proof of a fraudulent preference of a creditor contrary to the provisions of the act. The third subdivision under the general allegation of fraudulent preference alleges that the bankrupt paid the firm of Doyle & Joslin, of the city of Providence, the sum of two thousand dollars but a short time before the filing of his petition in bankruptcy, and when he knew himself to be insolvent and in contemplation of bankruptcy. It appears that on the 10th day of December, 1868, two days before the paper of the bankrupt went to protest. and he finally suspended payment, and nineteen days before the date of filing his petition in bankruptcy, he

---

[1] [Reported by Jabez S. Holmes, Esq., and here reprinted by permission.]

[2] [Affirming Case No. 4,051.]

was indebted to the firm of Doyle & Joslin for a balance due them upon an open account between the parties. Doyle & Joslin were acting apparently as bankers for the petitioner, receiving deposits from Doyle, and making him advances from time to time, keeping an interest account. On his examination, the bankrupt states that he was continually borrowing money from them from time to time. He would borrow money for a day or two, and return it in a day or two. On the 10th of December, the balance against Doyle exceeding four thousand dollars, Doyle & Joslin called for payment. Doyle had twenty shares of American Screw Company's stock standing in the name of Gideon Spencer, who had advanced nine thousand dollars on the stock, and held the title as collateral security for the loan. The note to Spencer for the nine thousand dollars was not due until Jan. 9, 1869. Doyle sold the stock, and, after paying the note to Gideon Spencer, paid the balance of the proceeds of the sale, about two thousand dollars, to Doyle & Joslin, still leaving a balance, as he states it, of twenty-one hundred dollars due them. This payment resulted pro tanto as a preference of Doyle & Joslin over the other creditors. Was this a transaction in the ordinary course of the bankrupt's business? or was it such a payment as, being made with a full knowledge of insolvency and with intent to give a preference, would be fraudulent in the contemplation of the bankrupt act?

Of his actual insolvency at that time there can no question be made. The total amount of his liabilities, as stated by himself at the hearing, amounted at that time to over five hundred thousand dollars, of which nearly two hundred thousand dollars was unsecured by the mortgages on his real estate and mill property. The assets in the hands of the assignee apparently are not sufficient to pay much, if any, more than ten per cent. on the debts not covered by the mortgages. Doyle's losses in the manufacture of beaver cloths between Oct. 1, 1866, and the time of his suspension, were $92,619.72. He says the beaver account was settled in December, 1868. "The final balance showed a loss at that time; though we knew all the time, if the goods sold, they would show this loss." That loss occurred some time between October, 1866, and December, 1868, without any exact time to assign to it. He had manufactured beavers, and shipped them to Hunt, Tillinghast & Co., of New York, up to Aug. 22, 1867, when the last consignment was made. They had advanced him large sums on the goods, and he says that when he "stopped manufacturing beavers, the beaver account looked as though it might show a large loss." After that he began to manufacture fancy cassimeres. "I kept," he says, "a cassimere account separate from the beaver account. That was an agreement with Hunt, Tillinghast & Co. I made this

trade with Hunt, Tillinghast & Co., that I should be able to draw my balances on fancy cassimeres. They were to advance me three-fourths on the goods. If any balances accrued, I was to draw them. They were not to apply them to the liquidation of the beaver account." The beaver cloths were selling slowly in May, 1867, at two dollars a yard, at which price they yielded a profit, after deducting commission and expenses, of "from ten to fifteen cents a yard." They did not sell very well, and there was a constant decline in prices. Only a few cases were sold at $2.00; then they declined to $1.80. There were but a few sold at $1.80; then they fell again, and continued to fall during the whole season. This decline in prices continued to the time of the final sale, at $1.12½. It is clearly apparent from the evidence that Hunt, Tillinghast & Co. had advanced him very large sums on the beaver account over and above the market value of the goods, and that when he ceased to manufacture that class of goods, and engaged in the manufacture of fancy cassimeres, it was with the hope that the profits on the cassimeres might compensate for the losses in the manufacture of beavers. Hunt, Tillinghast & Co. agreed to carry the large amount due them for over-drafts on the beaver account, to afford Doyle the benefit of any favorable change in prices of the beaver cloths, and to give him the benefit of the experiment in the manufacture of the cassimeres. But the price of the beavers constantly declined, and the manufacture of the cassimeres proved no less ruinous than that of the beavers, showing, from Feb. 1, 1868, to the final close of the account by the assignee, a loss of $67,123.02.

Without going more minutely into the details of the other transactions of the bankrupt, I am satisfied that long before the 10th of December, 1868, he was fully aware of his insolvency. estimating his property and assets at their market value at that time. He was struggling to keep his head above water, trusting solely to the indulgence of his creditors, who were willing, as he expresses it, so long as he kept his head above water, to do nothing to put it under, and vainly hoping for a favorable change in the market value of his goods that might extricate him from his embarrassments. His statements and his conduct in December, 1868, both show that he was fully aware that when the sustaining hands of Hunt, Tillinghast & Co. were withdrawn from him, he must fall. Most manifestly, he knew that he had not the means to meet his business liabilities in the ordinary and regular course of business. Of his actual insolvency, and of his knowledge of that insolvency at the time of the payment to Doyle & Joslin, I think there can be no reasonable doubt. "Insolvency," as used in this act, does not mean an absolute inability to pay one's debts at a future time upon a settlement and winding up of

all a trader's concerns; but a trader may be said to be in insolvent circumstances when he is not in a condition to pay his debts in the ordinary course, as persons carrying on trade usually do. Bayly v. Schofield, 1 Maule & S. 338; Thompson v. Thompson, 4 Cush. 134; Buckingham v. McLean, 13 How. [54 U. S.] 167; In re Gay [Case No. 5,279]. If the payments to Doyle & Joslin had been, as it is contended on the part of the bankrupt they were, payments made in the ordinary and regular course of the business of the bankrupt, as traders ordinarily pay small sums of borrowed money on call loans, I should not be inclined to consider such payments as made with an intent to give a fraudulent preference. If payments made in the regular and ordinary course of business by an insolvent, even with knowledge of his insolvency, are necessarily to be considered as preferences in fraud of the act, but few bankrupts could obtain a discharge, if opposed. The intent to secure to one creditor a preference over others must appear. The money paid to Doyle & Joslin was not paid in the ordinary and usual course of the bankrupt's business, nor out of the proceeds of his ordinary sales. Having previously mortgaged his other property to nearly its full value, he disposed of these shares of stock, apparently the only property remaining not so incumbered as not to be available to raise money upon, and, anticipating the payment of the debt for which the shares were pledged, he applied the balance of the proceeds to the reduction of the debt of Doyle & Joslin. From the condition of his property, he must have known that there was no reasonable expectation that his other creditors would fare as well in proportion to the debts. Although it does not appear that he expected then to stop payment immediately (on the contrary, it does appear that he was still expecting and struggling to keep his head above water, as he expresses it, for a time longer,) yet he was so thoroughly aware of his situation, that two days after, with twelve thousand dollars in amount of paper indorsed by perfectly responsible parties in his hands, he decided to suspend instantly, upon Hunt, Tillinghast & Co. refusing to discount it, without making an effort to obtain the money elsewhere.

I am forced most reluctantly to the conclusion, that the evidence in the case sustains the specification of a fraudulent preference, contrary to the provisions of the bankrupt act, in the payment to Doyle & Joslin of the sum of two thousand dollars, but a short time before the filing of his petition in bankruptcy, and when he knew himself to be insolvent. I come to this conclusion reluctantly, as before stated, because the evidence utterly fails to prove any actual fraud on the part of the bankrupt by any concealment of his assets or withholding of any information, and I find no evidence in any other transaction set forth in the record of any

conduct which ought to interfere with his discharge. But having designedly and intentionally paid a favored creditor when he was not able to pay all his debts in the usual and ordinary course of his business at the time, knowing such to be the condition of his affairs, meaning to secure that favored creditor whether his other creditors should be paid or not, he is not entitled to his discharge.

It is contended that the creditor receiving the payment or security should have knowledge of the insolvency at the time, in order to defeat the discharge on account of the preference given to him. This question is very fully considered in the very able opinion of Judge Fox, in Re Gay [supra]. This is one of the ablest and most exhaustive opinions which have been given on the construction of the bankrupt act. I entirely agree with the reasoning and the conclusions of the learned judge in that opinion. The twenty-ninth section of the act declares that "no discharge shall be granted if the bankrupt has given any fraudulent preferences contrary to the provisions of this act." By the thirty-fifth section, it is enacted, that, "if any person, being insolvent or in contemplation of insolvency, within four months before the filing of the petition for or against him, with a view to give a preference to any creditor or person having a claim against him, or who is under liability for him, procures any part of his property to be attached, or makes any payment, pledge, assignment, transfer, or conveyance of any part of his property, either directly or indirectly, absolutely or conditionally, the person receiving such payment, pledge, &c., having reasonable cause to believe such person is insolvent, and that the same is made in fraud of the provisions of this act, the same shall be void." I do not think that the question, whether such a conveyance made by an insolvent with knowledge of his insolvency, and with a view to give a preference to a creditor, would be in fraud of the provisions of the act, is dependent upon the knowledge of the creditor receiving the payment or security of the insolvency at the time. If the assignee would invalidate the payment, and recover back the payment or security given, it is necessary that he should have knowledge of the insolvency, and that the preference was given in fraud of the act on the part of the favored creditor. Until this knowledge is brought home to the creditor, he is allowed to retain the payment or security, which, so far as he is concerned, he has honestly received. But, so far as the bankrupt himself is concerned, if he has in fraud of the act given to one of his creditors a preference, and has concealed the knowledge of his insolvency from that creditor, it is certainly a greater injury to the other creditors, and as great a fraud upon the act as if the preference had been given to a creditor having full knowledge of his condition and purpose. In the latter

case, the preference can be impeached and avoided, and the property reclaimed by the assignee for the benefit of the general creditors; in the former case, the preference is valid and effectual. Decree affirmed.